1 │ Suzanne E. Rode (CA Bar No. 253830)
 │ CROWELL & MORING LLP
2 │ 275 Battery Street, 23rd Floor
 │ San Francisco, CA 94111
3 │ Telephone:  415-986-2800
 │ Facsimile:  415-986-2827
4 │ E-mail:  srode@crowell.com

5 │ Jerome A. Murphy (*pro hac vice pending*)
 │ Kent A. Gardiner (*pro hac vice pending*)
6 │ Matthew J. McBurney (*pro hac vice pending*)
 │ CROWELL & MORING LLP
7 │ 1001 Pennsylvania Avenue, N.W.
 │ Washington, D.C.  20004
8 │ Telephone:  202-624-2500
 │ Facsimile:  202-628-5116
9 │ E-mail:  jmurphy@crowell.com
 │        kgardiner@crowell.com
10 │        mmcburney@crowell.com

11 │ *Counsel for Plaintiff Oracle America, Inc.*

FILED

2010 SEP 24  P 3: 34

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
N.D. CA. SAN JOSE

ADR

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION**

| | |
|---|---|
| ORACLE AMERICA, INC., | Case No. **CV10 – 4340 HRL** |
| Plaintiff, | **COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF FOR** |
| v. | **(1)  VIOLATION OF THE SHERMAN ACT PURSUANT TO 15 U.S.C. § 1** |
| MICRON TECHNOLOGY, INC. and MICRON SEMICONDUCTOR PRODUCTS, INC., | **(2)  VIOLATION OF CALIFORNIA'S CARTWRIGHT ACT PURSUANT TO §§ 16700 ET SEQ. OF CAL. BUS. & PROF. CODE** |
| Defendants. | **(3)  VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION ACT PURSUANT TO §§ 17200 ET SEQ. OF CAL. BUS. & PROF. CODE** |
| | **DEMAND FOR JURY TRIAL** |

COMPLAINT OF ORACLE AMERICA, INC.

1    Plaintiff Oracle America, Inc., formerly known as Sun Microsystems, Inc. ("Oracle"),[1]

2 for its Complaint against Micron Technology, Inc. and Micron Semiconductor Products, Inc.

3 (collectively, "Micron"), alleges as follows:

4 **I.   Nature of Action**

5    1.    Oracle brings this action to recover damages caused by a long-standing

6 conspiracy among manufacturers of dynamic random access memory ("DRAM") computer

7 chips. As described in more detail below, in June 2002, the United States Department of Justice

8 (the "DOJ") announced that it had begun investigating a conspiracy among the world's DRAM

9 manufacturers. During the conspiracy, the DRAM manufacturers conspired to control

10 production capacity, raise prices or slow their decline, allocate customers, and otherwise

11 unlawfully overcharge their DRAM customers. During that same period, Sun purchased billions

12 of dollars worth of DRAM from the conspirators, including Micron, in the United States, and

13 was substantially injured in U.S. commerce. In addition, Sun purchased millions of dollars

14 worth of DRAM manufactured by the conspirators that was contained in finished products – such

15 as servers and workstations – manufactured by third-party external manufacturers and delivered

16 to Sun in California.

17    2.    As a result of the DOJ's investigation, five of the world's largest DRAM

18 manufacturers admitted their involvement in the conspiracy, including defendant Micron

19 Technology, Inc. and co-conspirators Hynix Semiconductor Inc., Infineon Technologies AG,

20 Elpida Memory, Inc., Samsung Electronics Co., Ltd., and Samsung Semiconductor, Inc. In fact,

21 Defendant Micron Technology, Inc. obtained amnesty from criminal prosecution by being the

22 first to admit its participation in the illegal cartel. Co-conspirators Infineon Technologies AG,

23 Hynix Semiconductor Inc., Elpida Memory, Inc., Samsung Electronics Co., Ltd., and Samsung

24 Semiconductor, Inc. all agreed to enter guilty pleas and pay fines totaling nearly $1 billion for

25

26 [1] On February 15, 2010, Oracle USA, Inc. merged with and into Sun Microsystems, Inc.
("Sun"). Sun, the surviving corporation, was then renamed "Oracle America, Inc." The events
27 described in this complaint all took place before the merger and involved Sun, not Oracle.
Accordingly, when referring to pre-merger events, we refer to Sun; post-merger, we refer to
28 Oracle.

1   their involvement in the conspiracy.  In doing so, Elpida Memory, Inc. specifically admitted that

2   it conspired to rig bids for DRAM sold to Sun.

3         3.     Furthermore, senior officials at Hynix, Samsung, Infineon, and Elpida pled guilty

4   in their individual capacities to colluding with their competitors to fix and raise DRAM prices.

5   One Elpida Memory (USA), Inc. executive and one Samsung Semiconductor, Inc. executive

6   specifically admitted to conspiring to rig bids submitted to Sun.

7         4.     Even Micron's former economist, Dr. Carl Shapiro (now the Deputy Assistant

8   Attorney General for Economics at the Antitrust Division of the DOJ), has agreed that the

9   DRAM manufacturers successfully increased DRAM prices through their illegal activities.  He

10  testified under oath that:

11               The conspirators' guilty pleas constitute "evidence – concession, at least, we'll

12               say concession that they were able to achieve some price increases at certain
             periods of time."

13               "There was ongoing conduct that in some cases influenced prices.  And that

14               conduct is all relevant, and I'm not arguing with you about that."

15        5.     Oracle now seeks treble damages and injunctive relief to remedy the injuries Sun

16  sustained as a result of the cartel's illegal activities beginning on or about August 1, 1998, and

17  continuing thereafter at least through June 15, 2002 (the "Conspiracy Period").

18  **II.**     **Jurisdiction and Venue**

19        6.     Oracle brings this action pursuant to Sections 4, 12, and 16 of the Clayton Act, 15

20  U.S.C. §§ 15, 22, and 26, for treble damages and injunctive relief, as well as reasonable

21  attorneys' fees and costs, with respect to the injuries Sun sustained arising from Micron's and its

22  co-conspirators' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

23        7.     Oracle also brings this action pursuant to Section 16750(a) of the California

24  Business and Professions Code for injunctive relief and treble damages Sun sustained as a result

25  of Micron's and its co-conspirators' violations of Section 16700 *et seq.* of the California

26  Business and Professions Code (the "Cartwright Act").  Oracle's claims also are brought

27  pursuant to Sections 17203 and 17204 of the California Business and Professions Code to obtain

28

COMPLAINT OF ORACLE AMERICA, INC.

1    restitution from and an injunction against Micron as a result of its violations of Section 17200 *et*

2    *seq.* of the California Business and Professions Code (the "Unfair Competition Act").

3          8.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and

4    1337(a). This Court has supplemental jurisdiction over Oracle's state law claims pursuant to 28

5    U.S.C. § 1367(a).

6          9.      Venue is proper in this judicial district pursuant to 15 U.S.C. §§ 15 and 22, and 28

7    U.S.C. § 1391(b), (c), and (d), in that at least one defendant resides in this judicial district or is

8    licensed to do business or is doing business in this judicial district. Venue is also proper in this

9    judicial district pursuant to the provisions of Sections 16750(a) and 17203 of the California

10    Business and Professions Code. The unlawful conduct undertaken pursuant to the combination

11    and conspiracy alleged herein had and has a direct effect on business within the State of

12    California, and the trade and commerce described below is carried on to a significant degree

13    within the State of California.

14          10.      This Court has *in personam* jurisdiction over each defendant, because, *inter alia*,

15    each defendant: (a) transacted business throughout the United States, including this district; (b)

16    manufactured, sold, shipped, and delivered substantial quantities of DRAM throughout the

17    United States, including this district; (c) had substantial contacts with the United States,

18    including this district; and (d) was engaged in an illegal scheme and price-fixing conspiracy that

19    was directed at and had the intended effect of causing injury to persons and entities residing in,

20    located in, or doing business throughout the United States, including this district.

21    **III.**      **Intradistrict Assignment**

22          11.      Because Oracle's predecessor, Sun Microsystems, Inc., maintained its principal

23    place of business within Santa Clara County, and defendant Micron Technology, Inc. maintains

24    an office within Santa Clara County, this action arises in Santa Clara County for the purposes of

25    Civil Local Rule 3-2(c) and should therefore be assigned to the San Jose Division. In addition,

26    because this action concerns substantially the same parties and events and alleges substantially

27    the same antitrust conspiracy as those alleged in the following cases currently pending before

28    Judge Hamilton in the Oakland Division: (a) *In re DRAM Antitrust Litigation*, Case No. C 02-

1    01486 PJH, (b) *Edge Electronics, Inc. v. Hynix Semiconductor Inc., et al.*, Case No. C 07-01207-

2    PJH; (c) *Unisys Corporation v. Hynix Semiconductor Inc., et al.*, Case No. C 06-02915-PJH; (d)

3    *Jaco Electronics, Inc. v. Hynix Semiconductor Inc., et al.*, Case No. C 07-01212-PJH; (e) *DRAM*

4    *Claims Liquidation Trust, by its Trustee, Wells Fargo Bank, N.A. v. Hynix Semiconductor Inc. et*

5    *al.*, Case No. C 07-01381-PJH, and (f) *All American Semiconductor, Inc. v. Hynix*

6    *Semiconductor, Inc., et al.*, Case No. C07-01200 PJH, it qualifies as a related action under Civil

7    Local Rule 3-12 and, therefore, should be transferred to Judge Hamilton.

8    **IV.**    **Parties**

9      **A.**    **Plaintiff Oracle**

10      12.    Plaintiff Oracle America, Inc. is a Delaware corporation with its headquarters in

11    Redwood Shores, California.  During the Conspiracy Period, Oracle was known as Sun

12    Microsystems, Inc. ("Sun") and was headquartered in Santa Clara, California.  Sun was a leading

13    manufacturer of computer servers, workstations, and storage systems.  It procured DRAM in the

14    United States directly from DRAM manufacturers, including Micron and its co-conspirators, for

15    incorporation into Sun-branded servers and workstations.  In addition, Sun purchased DRAM

16    manufactured by Micron and its co-conspirators that was contained in finished servers and

17    workstations assembled by third-party external manufacturers at Sun's request and then

18    delivered to Sun in California.

19      13.    On January 26, 2010, Oracle Corporation finalized its acquisition of the common

20    stock of Sun.  It did so by means of a merger of one of its wholly owned subsidiaries with and

21    into Sun such that Sun became a wholly owned subsidiary of Oracle and was then renamed

22    "Oracle America, Inc."  The merger was completed on February 15, 2010.  With that stock

23    purchase, Oracle acquired all of Sun's antitrust claims, including those stemming from purchases

24    of DRAM at artificially-inflated prices.

25      **B.**    **Defendant Micron**

26      14.    Defendant Micron Technology, Inc. is a Delaware corporation with its principal

27    place of business at 8000 South Federal Way, Boise, Idaho 83707 and offices at 3060 North 1st

28    Street, San Jose, CA 95134.  During the Conspiracy Period, Micron Technology, Inc., a

1 manufacturer of DRAM, sold and distributed DRAM throughout the world, including the United
2 States. As a U.S.-based manufacturer of DRAM with facilities throughout the world, Micron
3 Technology, Inc. manipulated the price of DRAM charged around the globe, including in the
4 United States, by intentionally restricting the production capacity of its manufacturing plants
5 located throughout the world and directing its international affiliates, including those located in
6 the United States, to charge collusively-established prices for DRAM. As a result of Micron
7 Technology, Inc.'s illegal activities directed at the United States and elsewhere, Sun paid
8 artificially-inflated prices for the DRAM it purchased in the United States.

9     15. Defendant Micron Semiconductor Products, Inc. is an Idaho corporation located
10 at 8000 South Federal Way, Boise, Idaho, 83707 and a wholly-owned subsidiary of defendant
11 Micron Technology, Inc. During the Conspiracy Period, Micron Semiconductor Products, Inc.
12 sold DRAM manufactured by Micron Technology, Inc., including through its Crucial
13 Technology retail sales division, to computer manufacturers and other end-users throughout the
14 United States. As a result of Micron Semiconductor Products, Inc.'s illegal activities, Sun paid
15 artificially-inflated prices for the DRAM it purchased in the United States.

16     16. Defendants Micron Technology, Inc. and Micron Semiconductor Products, Inc.
17 are referred to collectively herein as "Micron." The Micron companies were members of the
18 conspiracy that is the subject of this Complaint by virtue of their participation in the conspiracy
19 through the actions of their respective officers, employees, and representatives acting with actual
20 or apparent authority. Alternatively, defendant Micron Semiconductor Products, Inc. was a
21 member of the conspiracy by virtue of its status during the Conspiracy Period as the alter ego or
22 agent of Micron Technology, Inc. Micron Technology, Inc. dominated or controlled Micron
23 Semiconductor Products, Inc. regarding conspiracy activities and used that domination or control
24 to charge artificially high prices for DRAM. During the Conspiracy Period, Micron sold DRAM
25 directly to Sun in the United States. In addition, Micron sold DRAM to third-party external
26 manufacturers for inclusion in finished servers and workstations that were delivered to Sun in
27 California.
28

C. **Co-conspirators**

17.     Co-conspirator Samsung Electronics Co., Ltd. is a Korean corporation with its principal place of business at 750 2-ga Taepyong-ro, Chung-gu, Seoul, 100-742, Korea. During the Conspiracy Period, Samsung Electronics Co., Ltd., a manufacturer of DRAM, sold and distributed DRAM throughout the world, including the United States. As a Korea-based manufacturer of DRAM with facilities throughout the world, Samsung Electronics Co., Ltd. manipulated the price of DRAM charged around the globe, including in the United States, by intentionally restricting the production capacity of its manufacturing plants located in Asia and directing its international affiliates, including those located in the United States, to charge collusively-established prices for DRAM. As a result of Samsung Electronics Co., Ltd.'s illegal activities directed at the United States and elsewhere, Sun paid artificially-inflated prices for the DRAM it purchased in the United States.

18.     Co-conspirator Samsung Semiconductor, Inc. is a California corporation located at 3655 North First Street, San Jose, California, 95134 and a wholly-owned subsidiary of Samsung Electronics Co., Ltd. During the Conspiracy Period, Samsung Semiconductor, Inc. sold and distributed DRAM throughout the United States. As a result of Samsung Semiconductor, Inc.'s illegal activities, Sun paid artificially-inflated prices for the DRAM it purchased in the United States.

19.     Co-conspirators Samsung Electronics Co., Ltd. and Samsung Semiconductor, Inc. are referred to collectively herein as "Samsung." The Samsung companies were members of the conspiracy that is the subject of this Complaint by virtue of their participation in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority. Alternatively, co-conspirator Samsung Semiconductor, Inc. was a member of the conspiracy by virtue of its status during the Conspiracy Period as the alter ego or agent of Samsung Electronics Co., Ltd. Samsung Electronics Co., Ltd. dominated or controlled Samsung Semiconductor, Inc. regarding conspiracy activities and used that domination or control to charge artificially high prices for DRAM. During the Conspiracy Period, Samsung sold DRAM directly to Sun in the United States. In addition, Samsung sold DRAM to third-party external

1 manufacturers for inclusion in finished servers and workstations that were delivered to Sun in

2 California.

3      20.    Co-conspirator Hynix Semiconductor Inc. is a Korean corporation with its

4 principal place of business at San 136-1, Ami-Ri, Bubal-eub, Ichon-si, Kyongki-do, Korea.

5 During the Conspiracy Period, Hynix Semiconductor Inc., a manufacturer of DRAM, sold and

6 distributed DRAM throughout the world, including the United States.  As a Korea-based

7 manufacturer of DRAM with facilities throughout the world, Hynix Semiconductor Inc.

8 manipulated the price of DRAM charged around the globe, including in the United States, by

9 intentionally restricting the production capacity of its manufacturing plants located throughout

10 the world and directing its international affiliates, including those located in the United States, to

11 charge collusively-established prices for DRAM.  As a result of Hynix Semiconductor Inc.'s

12 illegal activities directed at the United States and elsewhere, Sun paid artificially-inflated prices

13 for the DRAM it purchased in the United States.

14      21.    Co-conspirator Hynix Semiconductor America Inc. is a California corporation

15 located at 3101 North First Street, San Jose, California 95134 and a wholly-owned subsidiary of

16 Hynix Semiconductor Inc.  During the Conspiracy Period, Hynix Semiconductor America Inc.

17 sold and distributed DRAM throughout the United States.  As a result of Hynix Semiconductor

18 America Inc.'s illegal activities, Sun paid artificially-inflated prices for the DRAM it purchased

19 in the United States.

20      22.    Co-conspirators Hynix Semiconductor Inc. and Hynix Semiconductor America

21 Inc. are referred to collectively herein as "Hynix."  The Hynix companies were members of the

22 conspiracy that is the subject of this Complaint by virtue of their participation in the conspiracy

23 through the actions of their respective officers, employees, and representatives acting with actual

24 or apparent authority.  Alternatively, co-conspirator Hynix Semiconductor America Inc. was a

25 member of the conspiracy by virtue of its status during the Conspiracy Period as the alter ego or

26 agent of Hynix Semiconductor Inc.  Hynix Semiconductor Inc. dominated or controlled Hynix

27 Semiconductor America Inc. regarding conspiracy activities and used that domination or control

28 to charge artificially high prices for DRAM.  During the Conspiracy Period, Hynix sold DRAM

1   directly to Sun in the United States.  In addition, Hynix sold DRAM to third-party external

2   manufacturers for inclusion in finished servers and workstations that were delivered to Sun in

3   California.

4          23.     Co-conspirator Elpida Memory, Inc. is a Japanese corporation with its principal

5   place of business at Sumitomo Seimei Yaesu Building, 3F, 2-1 Yaesu 2-chome, Chuo-ku, Tokyo,

6   Japan.  During the Conspiracy Period, Elpida Memory Inc., a manufacturer of DRAM, sold and

7   distributed DRAM throughout the world, including the United States.  As a Japan-based

8   manufacturer of DRAM with facilities throughout the world, Elpida Memory, Inc. manipulated

9   the price of DRAM charged around the globe, including in the United States, by intentionally

10  restricting the production capacity of its manufacturing plants located throughout the world and

11  directing its international affiliates, including those located in the United States, to charge

12  collusively-established prices for DRAM.  As a result of Elpida Memory, Inc.'s illegal activities

13  directed at the United States and elsewhere, Sun paid artificially-inflated prices for the DRAM it

14  purchased in the United States.

15         24.     Co-conspirator Elpida Memory (USA) Inc. is a Delaware corporation located at

16  2001 Walsh Ave, Santa Clara, California, 95050 and a wholly-owned subsidiary of Elpida

17  Memory, Inc.  During the Conspiracy Period, Elpida Memory (USA) Inc. sold and distributed

18  DRAM throughout the United States.  As a result of Elpida Memory (USA) Inc.'s illegal

19  activities, Sun paid artificially-inflated prices for the DRAM it purchased in the United States.

20         25.     Co-conspirators Elpida Memory, Inc. and Elpida Memory (USA) Inc. are referred

21  to collectively herein as "Elpida."  The Elpida companies were members of the conspiracy that is

22  the subject of this Complaint by virtue of their participation in the conspiracy through the actions

23  of their respective officers, employees, and representatives acting with actual or apparent

24  authority.  Alternatively, co-conspirator Elpida Memory (USA) Inc. was a member of the

25  conspiracy by virtue of its status during the Conspiracy Period as the alter ego or agent of Elpida

26  Memory, Inc.  Elpida Memory, Inc. dominated or controlled Elpida Memory (USA) Inc.

27  regarding conspiracy activities and used that domination or control to charge artificially high

28  prices for DRAM.  During the Conspiracy Period, Elpida sold DRAM directly to Sun in the

1   United States. In addition, Elpida sold DRAM to third-party external manufacturers for

2   inclusion in finished servers and workstations that were delivered to Sun in California.

3        26.    Co-conspirator Infineon Technologies AG is a German corporation with its

4   principal place of business at Am Campeon 1-12, Munich, 85779, Germany. During the

5   Conspiracy Period, Infineon Technologies AG, a manufacturer of DRAM, sold and distributed

6   DRAM throughout the world, including the United States. As a Germany-based manufacturer of

7   DRAM with facilities throughout the world, Infineon Technologies AG manipulated the price of

8   DRAM charged around the globe, including in the United States, by intentionally restricting the

9   production capacity of its manufacturing plants located throughout the world and directing its

10  international affiliates, including those located in the United States, to charge collusively-

11  established prices for DRAM. As a result of Infineon Technology AG's illegal activities

12  directed at the United States and elsewhere, Sun paid artificially-inflated prices for the DRAM it

13  purchased in the United States.

14       27.    Co-conspirator Infineon Technologies North America Corporation is a Delaware

15  corporation located at 640 N. McCarthy Boulevard, Milpitas, California 95035 and a wholly-

16  owned subsidiary of Infineon Technologies AG. During the Conspiracy Period, Infineon

17  Technologies North America Corporation sold and distributed DRAM throughout the United

18  States. As a result of Infineon Technologies North America Corporation's illegal activities, Sun

19  paid artificially-inflated prices for the DRAM it purchased in the United States.

20       28.    Co-conspirators Infineon Technologies AG and Infineon Technologies North

21  America Corporation are referred to collectively herein as "Infineon." The Infineon companies

22  were members of the conspiracy that is the subject of this Complaint by virtue of their

23  participation in the conspiracy through the actions of their respective officers, employees, and

24  representatives acting with actual or apparent authority. Alternatively, co-conspirator Infineon

25  Technologies North America Corporation was a member of the conspiracy by virtue of its status

26  during the Conspiracy Period as the alter ego or agent of Infineon Technologies AG. Infineon

27  Technologies AG dominated or controlled Infineon Technologies North America Corporation

28  regarding conspiracy activities and used that domination or control to charge artificially high

1  prices for DRAM.  During the Conspiracy Period, Infineon sold DRAM directly to Sun in the

2  United States.  In addition, Infineon sold DRAM to third-party external manufacturers for

3  inclusion in finished servers and workstations that were delivered to Sun in California.

4         29.    In 2006, Infineon spun-off its DRAM business to create Qimonda AG.

5  **V.**    **Trade and Commerce**

6         30.    During the Conspiracy Period, Micron and its co-conspirators sold and shipped

7  substantial quantities of DRAM in a continuous and uninterrupted flow of interstate and

8  international commerce to customers located in countries and states other than the countries and

9  states in which Micron and its co-conspirators manufacture DRAM.

10        31.    The business activities of Micron and its co-conspirators that are the subject of

11  this Complaint were within the flow of, and substantially affected, interstate and international

12  trade and commerce.  The conspiracy had a direct, substantial, and reasonably foreseeable effect

13  on United States commerce.

14  **VI.**   **Statement of Facts**

15        **A.**    **DRAM**

16        32.    DRAM is a type of integrated circuit that reads, stores, and writes bits of

17  electronic data in a desired sequence.  It is the most common and widely used type of

18  semiconductor memory.  DRAM can be sold as individual chips or as components of memory

19  modules consisting of several chips attached to a printed circuit board, often referred to as "dual

20  in-line memory modules" or "DIMMs".  DRAM is primarily used in computers, including

21  personal computers, workstations and servers, as well as other electronic devices such as

22  printers, fax machines, digital cameras and video recorders, video game equipment, personal

23  digital assistants and cellular and wireless telephones.

24        33.    DRAM is a standardized product that is highly substitutable across manufacturers.

25  It can be described by several primary characteristics, including density, technology, and speed.

26  Other DRAM characteristics include chip and module organization or configuration, form factor,

27  error checking, and latency.  These standard product characteristics allow purchasers and sellers

28

1  to easily compare prices among a wide variety of products with different combinations of these

2  characteristics.

3      34.    When testifying before the U.S. International Trade Commission ("ITC"),

4  Michael Sadler, Micron's Vice President of Worldwide Sales, admitted as much:

> The vast majority [of] Micron's competitors, including Hynix, manufacture
> DRAMs that are equivalent in specifications and performance to our own. The
> DRAM products sold by the U.S. domestic industry and imports by Hynix are
> interchangeable.
>
> Micron, Infineon, Samsung and Hynix are the world's major DRAM producers.
> We all compete for the same customers and sell essentially the same DRAM
> products.

10     35.    Micron corroborated Mr. Sadler's ITC testimony in its pre-hearing brief,

11  explaining that: "those [DRAMs] produced by Hynix are easily substitutable with those

12  produced by the U.S. industry . . . DRAMs and DRAM modules are generally interchangeable,

13  regardless of source . . . . All respondents agreed there were no important differences with

14  respect to product characteristics and sales conditions between domestic, subject and nonsubject

15  merchandise. Hynix manufactures the same DRAM products and sells them to the same

16  customers as does the domestic industry."

17     36.    At the same ITC hearing, Robert LeFort, President of Infineon North America,

18  testified that "[n]either we nor any of our rivals can [charge more than each other] because

19  commodity DRAMs from different manufacturers are highly substitutable with each other."

20     37.    In its final decision, the ITC, citing briefs from Micron, Hynix, and Infineon,

21  concluded that "DRAMs are considered commodity products and compete largely on the basis of

22  price."

23     38.    Similarly, in testimony to Congress, Micron's Chairman, CEO, and President,

24  Steve Appleton, asserted that "DRAMs are a commodity product, and therefore are highly price-

25  sensitive."

26     39.    DRAM is manufactured in silicon wafer manufacturing facilities commonly

27  referred to as "fabs." Fabs generally take at least a year, if not longer, to construct and cost

28  billions of dollars. The cost of constructing DRAM fabs has increased over time as more

1    complicated and expensive equipment has been introduced.  These large capital costs and long

2    construction times serve as a significant entry barrier to DRAM production.  The enormous costs

3    associated with the construction of fabs leads to an industry characterized by very high fixed

4    costs of production.  These characteristics of the DRAM industry increase the likelihood of

5    collusion among DRAM manufacturers.

6    **B.    The DRAM Market**

7         40.    The DRAM market is highly concentrated.  For example, in 2000, Micron and its

8    four co-conspirators accounted for over 75% of worldwide DRAM revenue.

9         41.    The DRAM market is characterized by several well-established sales channels.

10   Large purchasers of DRAM, such as Sun (and now Oracle) and other major server

11   manufacturers, along with the major personal computer ("PC") manufacturers, purchase DRAM

12   directly from DRAM manufacturers pursuant to long-term contracts that require the DRAM

13   manufacturers to provide additional services such as stable supply and inventory management.

14   These long-term contracts do not establish pricing for contract customers; rather, prices are

15   determined by frequent and regular negotiations with the DRAM manufacturers.

16        42.    The contracts between the DRAM manufacturers and their larger customers

17   commonly include most favored customer ("MFC") clauses, which stipulate that prices for a

18   customer with an MFC clause will be at least as low as prices for other customers.  These clauses

19   effectively prevent a supplier from increasing (or decreasing) the price for one customer without

20   also increasing (or decreasing) the price for other customers.  Because MFC clauses are always

21   adhered to, they limit a DRAM supplier's ability to raise (or decrease) prices for one large

22   customer without also raising (or decreasing) prices for other large customers.

23        43.    In addition to contract sales, DRAM is also sold through the spot market.  Spot

24   market sales are typically one-time sales whose terms are negotiated in isolation.  Because there

25   is no centralized market, many spot market sales are arranged using brokers to match up buyers

26   and sellers.  There are several online services, such as DRAMeXchange, that track the prices

27   paid by buyers in the spot market and make them available to all participants in the DRAM

28

1    market. During the Conspiracy Period, DRAMeXchange and other similar services also made

2    contract pricing information available to market participants.

3         44.    In addition to these services, there are a number of third-party analysts that

4    publish regular reports on prices, price trends, and price movements in the DRAM market. As a

5    result of all these sources, DRAM pricing is transparent, and DRAM purchasers (both contract

6    and spot market purchasers) regularly reference this price information in the course of

7    negotiating DRAM prices with DRAM manufacturers.

8         45.    The combination of transparent price information, well-established sales channels,

9    MFC clauses, and standardized product characteristics lead DRAM prices to move together over

10   time for a variety of customers.

11   **C.    Sun's DRAM Purchases**

12        46.    From 1998 through 2002, Sun purchased over $2 billion worth of DRAM in the

13   United States for incorporation into the servers and workstations it designed, built, and sold to its

14   customers.

15        47.    For much of the Conspiracy Period, Sun purchased DRAM pursuant to quarterly

16   price negotiations with DRAM manufacturers.

17        48.    Beginning in the summer of 2001, Sun began to hold "dynamic bidding events,"

18   or "DBEs," in which the participating DRAM manufacturers bid for shares of Sun's purchases of

19   specific DRAM products in a reverse auction format. Even after Sun began using DBEs, it

20   continued to use traditional negotiations for the purchase of some DRAM products and for

21   purchases of DRAM in excess of what was allocated through the DBEs.

22        49.    Sun employed a team of buyers and supply chain managers based in the United

23   States who negotiated the purchase of DRAM directly with the DRAM manufacturers. These

24   employees used publicly available information regarding DRAM prices in the course of their

25   price negotiations, including available information about spot market prices, contract prices paid

26   by other large PC and server manufacturers, and other information regarding price trends and

27   supply conditions in the market. Even when Sun purchased DRAM pursuant to DBEs, Sun used

28

1  a weighted average of spot and contract prices to calculate the price from which the reverse

2  auctions would begin.

3        50.      During the Conspiracy Period, Sun purchased both industry-standard DRAM

4  modules identical to those purchased by other large PC and server manufacturers, as well as

5  customized, proprietary modules that could be used only in Sun products. These custom

6  modules, such as the "NG DIMM," incorporated industry-standard DRAM chips no different

7  than those purchased by the other large server and PC manufacturers. The customized elements

8  of these modules consisted of components other than DRAM, such as a printed circuit board,

9  memory bus, and memory controller, as well as the configuration of all these elements on the

10  module. The price of these customized elements was reflected in a "module adder," which was a

11  fixed premium added to the total price of the individual DRAM chips included on a particular

12  custom module. When Sun negotiated the price of these custom modules, it negotiated prices on

13  the basis of the underlying DRAM chips and simply added the module adder to the final

14  negotiated price to arrive at the total purchase price.

15        51.      In addition, Sun purchased finished servers and workstations in California

16  containing millions of dollars worth of DRAM manufactured by Micron and its co-conspirators.

17  Those servers and workstations were assembled on Sun's behalf for sale to its customers by

18  third-party external manufacturers, such as MiTAC International Corporation, Celestica Inc.,

19  Benchmark Electronics, Inc., Smart Modular Technologies, Inc., Solectron Corporation, and

20  Expansion Electronics Inc. The price of the DRAM contained in those servers and workstations

21  was negotiated by Sun's buyers and supply chain managers based in the United States pursuant

22  to the procurement mechanisms discussed above and then relayed to the third-party external

23  manufacturers. The third-party external manufacturers would then request deliveries of DRAM

24  from Micron and its co-conspirators at the prices negotiated by Sun.

25    **D.      The DRAM Cartel**

26        52.      During the Conspiracy Period, Micron participated in a conspiracy to fix the price

27  of DRAM together with other DRAM manufacturers, including Samsung, Hynix, Elpida and

28

1   Infineon (the "conspirators").  The conspiracy artificially inflated the price Sun paid for DRAM

2   in the United States above what Sun would have paid had the conspirators competed.

3        53.    The conspirators participated in and implemented their conspiracy through

4   communications among their executives and representatives regarding the price of DRAM in

5   advance of sales to Sun and other customers.  Representatives of the conspirators often discussed

6   future prices and exchanged price quotes by phone or in face-to-face meetings with competitors,

7   and then relayed information learned through those communications to other members of the

8   sales force at their company, including upper-level management.  Through this exchange of

9   future price information, the conspirators were able to coordinate their pricing to specific

10   customers across numerous transactions.

11        54.    The conspirators communicated with each other and exchanged competitive

12   pricing information at all levels of their sales hierarchy.  Their account managers for a particular

13   customer had open lines of communication and reached out in advance of price negotiations to

14   discuss each others' offers and where pricing would end up for that negotiation period.  Those

15   account managers would often pass this information up their respective corporate hierarchies to

16   the sales and marketing executives that made decisions about final DRAM prices.  These higher-

17   level executives themselves frequently engaged in communications with their peers at competitor

18   companies and discussed pricing and the future direction of pricing both at a higher level and

19   with respect to particular transactions.

20        55.    This pattern of price communications was pervasive throughout the Conspiracy

21   Period and enabled the conspirators to reduce competition in the sale of DRAM to a variety of

22   customers, including Sun.

23        56.    The conspirators communicated most frequently with respect to the large server

24   and PC manufacturers, known in the industry as "OEMs," short for "original equipment

25   manufacturers."  The OEMs included Dell, Inc. ("Dell"), Hewlett-Packard Company ("HP"),

26   Compaq Computer Corporation ("Compaq"), International Business Machines Corporation

27   ("IBM"), Apple Computer Inc. ("Apple"), and Gateway, Inc. (Gateway").  The conspirators

28   focused their conspiratorial communications and price information exchanges on these customers

1 because they were both the largest purchasers of DRAM in the industry and negotiated prices

2 more frequently than other DRAM customers, often twice a month or more.  The conspirators

3 communicated with respect to OEM pricing extensively throughout the Conspiracy Period and

4 were able to limit competition and reach understandings regarding the prices offered to the

5 OEMs.  Examples of such communications include:

6         a.    August 23, 1998 internal Infineon [then Siemens] e-mail entitled "DELL

7               pricing" stating "the prices I got from Samsung is [sic] the same as last

8               month's.  Same goes for Micron."

9         b.    August 26, 1998 internal Hynix e-mail about pricing to Apple stating "I

10               talked with the Samsung guy and they quoted higher price ~$36.00.  I am

11               working to get final feedback of what they finalized on, but my guess is

12               $34–$35."

13         c.    February 19, 1999 internal Micron e-mail stating "Spoke to Samsung guy

14               last night and they said they are looking to hold their pricing at current

15               levels for March (around $80 and $159)."

16         d.    March 9, 1999 internal Micron e-mail regarding HP pricing stating "I

17               spoke with Samsung and they are at $77 (approx)."

18         e.    March 25, 1999 internal Infineon e-mail referencing discussion of price

19               coordination related to Dell among competitors, including Micron and

20               Samsung, and stating "All the competition says $67 target is unreasonable.

21               Everyone thinks the spot market is around $8.30-$8.40 . . . The following

22               represents their comments about pricing."

23         f.    July 24, 2000 internal Infineon e-mail stating "Here is a bit of information

24               on the 4th Quarter numbers that Compaq is looking for.  I talked to

25               Samsung, Micron, and Hyundai [Hynix's predecessor] . . . Pricing:

26               Everyone looking to raise August 1, Going in at $70 and closing at $67 to

27               $68."

28

g.   August 25, 2000 internal Infineon e-mail reflecting communications with Samsung, Micron and Hynix regarding holding price until a shortage sets in that justifies a price increase and stating "I have talked to Micron, Samsung, and Hyundai [Hynix's predecessor] and all three swear they have made no movement on price. Samsung and Micron say they are still at $67.00 and Hyundai is at $65.00."

h.   October 17, 2000 internal Hynix e-mail referencing contacts with Micron and Infineon regarding future pricing at Compaq and stating "I spoke to my contact at Micron late yesterday and he says Infineon was going to go to $45 to $46 today. This is per the Infineon account manager. Micron will follow or lead from there, guaranteed."

i.   February 15, 2001 internal Hynix e-mail stating "Could you update the current competitor's price? I heard that Gateway wants price drop by $19/$38." The reply states, "yes this is what they are asking. We verified [these prices] with micron and infineon."

j.   March 29, 2001 internal Hynix e-mail about pricing to IBM stating "Before you submit our final price as you suggested for the first part of April, please have a last minute coordination with [Samsung]. They are saying they will go to $38 . . . . If you can have SS [Samsung] lead the charge, you will follow Samsung's leadership."

k.   March 29, 2001 internal Samsung e-mail reflecting an extensive dialogue among Samsung, Hynix, Micron, Infineon, and Elpida regarding pricing strategies for Compaq and stating "Hynix has been polling the DRAM competitors trying to stir up consensus for 128Mb SDR price increases."

l.   November 26, 2001 internal Micron e-mail stating "We will begin price discussions with the OEMs today. Infineon has already laid the ground work by trying to lift pricing a few weeks ago . . . Samsung has also had discussions with the OEMs early last week and is preparing them for

1    increases [in] the first part of December. The consensus from all suppliers

2    is that if Micron makes the move, all of them will do the same and make it

3    stick."

4    m.    December 3, 2001 internal Micron e-mail reflecting information received

5          from Samsung, Hynix, and Infineon about their plans to raise prices at

6          OEMs and stating that Samsung was raising prices at Apple, that $13.25

7          was their minimum price, and "anything lower will not get Samsung

8          parts."

9    n.    January 3, 2002 internal Micron e-mail entitled "pricing" stating "Mike B.

10         from Sammy [Samsung] called" and "[w]anted some direction."

11   o.    February 13, 2002 internal Micron e-mail stating "[h]eard from our

12         contact at Samsung that they are not quoting anything under $2.50, and are

13         shooting for $2.75." A subsequent email indicates that the Micron

14         employees support moving "the price guidelines up to $2.50" and that they

15         "will need to increase pricing on 64Meg" in response to this information.

16   p.    February 28, 2002 internal Micron e-mail stating "Just talked to Hynix . . .

17         pricing around $1.40 to $1.50 [for 1Mx16]" and "Talked to Sammy

18         [Samsung] and they have started to indicate [M]arch pricing at $3.50 but

19         will settled [sic] between $2.75 to $3.10."

20   q.    March 14, 2002 internal Infineon e-mail stating "Samsung has submitted

21         at $45 and have a bottom of $44. Hynix has the same base lines. Micron

22         is submitting a 10% increase and will not go below a 5% increase which

23         has been our strategy. All feel that this is not the time to let up. If we go

24         flat anywhere then all of the above are ready to respond to flat but we

25         would be leading the way at Compaq."

26   r.    June 11, 2002 internal Elpida e-mail about pricing to HP stating "So far, I

27         have only spoken with Samsung and Micron. My request is based on what

28         we (Elpida, Samsung, Micron) believe market is going to actually close on

COMPLAINT OF ORACLE AMERICA, INC.

1             Friday.  Depending on where the market closes on Friday, we might have

2             to adjust higher or lower."

3     57.     Further:

4          a.     Micron's Vice President of Worldwide Sales, Mike Sadler, testified under

5             oath at trial that each Micron account manager responsible for the six

6             OEM accounts contacted Micron's competitors to obtain pricing

7             information in furtherance of the conspiracy.  They included:  Tom Addie

8             (Apple), Mike Grant (HP/Compaq), Keith Weinstock (IBM), Dan

9             Morrissey (Dell), and Jon Ostberg (Gateway).

10         b.     Mr. Morrissey had numerous conversations with his counterparts at

11             Hynix, Samsung, and Infineon relating to Dell pricing.  Mr. Weinstock

12             had numerous conversations with his counterparts at Hynix, Elpida,

13             Samsung, and Infineon relating to IBM pricing.  Mr. Addie had numerous

14             conversations with his counterparts at Samsung, Hynix, and Infineon

15             relating to Apple pricing.  And Mr. Ostberg had numerous conversations

16             with his counterparts at Infineon, Hynix, and Samsung relating to Gateway

17             pricing.

18         c.     Micron's senior director of sales, Steven Thorsen, who had responsibility

19             for supervising Micron's various account managers, was also aware that

20             the account managers were in regular contact with competitors and were

21             engaged in mutual exchanges of pricing information with those

22             competitors regarding the OEMs.  Mr. Thorsen used the competitive

23             information his account managers collected to make pricing decisions for

24             Micron.  In addition, Mr. Thorsen, himself, engaged in regular and direct

25             communications with his counterparts at Micron's competitors regarding

26             DRAM pricing for the OEMs.

27     58.     Although the majority of communications in furtherance of the conspiracy

28 concerned pricing for the OEMs, the conspirators in no way limited the scope of their

COMPLAINT OF ORACLE AMERICA, INC.

1    anticompetitive conduct to those customers.  They all engaged in the same kind of

2    communications with respect to customers other than the OEMs, including Sun.  Through such

3    communications, the conspirators reached understandings with respect to the DRAM prices

4    offered to Sun.  Examples of such communications include:

5        a.   April 29, 1999 internal Hynix e-mail stating "Please verify our

6            competitor's current and May 64M EDO Price of IBM, Compaq, Dell,

7            Gateway and Sun-Mitac. We will use this informatin [sic] to decide our

8            May EDO price."

9        b.   March 21, 2000 internal Samsung e-mail entitled "Sun pricing Q200"

10           stating "Just a brief update. I will send my recommendations by the end of

11           the week as I still need to get hold of the Micron guy locally, who is

12           obviously a key player."

13       c.   March 6, 2001 internal Hynix e-mail stating "Today I contacted Mr.

14           Yeongho Kang, Associate Director of DRAM Marketing in SSA

15           [Samsung] who is responsible for DRAM price strategy. And I got some

16           information as follows."  The e-mail then discusses Samsung's situation at

17           both Dell and Sun and the ramifications for Hynix.

18       d.   June 6, 2001 internal Infineon e-mail entitled "Samsung Pricing"

19           indicating that Infineon, Samsung, and Micron exchanged price targets for

20           Sun for the upcoming quarter.

21       e.   August 8, 2001 internal Infineon e-mail indicating that the President of

22           Samsung identified Sun as "Public Enemy Number 1" to its co-

23           conspirators as a result of Sun's newly-instituted DBE process.

24       f.   September 18, 2001 internal Elpida e-mail entitled "1G NG DIMM for

25           Sun" indicating that Elpida resisted a price decrease proposed by Sun by

26           coordinating with Infineon and Samsung regarding the prices they were

27           giving to Sun.

28

COMPLAINT OF ORACLE AMERICA, INC.

g.   November 14, 2001 internal Infineon e-mail entitled "Sun/Samsung Update" stating "Here is a brief summary of my conversation with Samsung this morning (re Sun): . . . "

h.   November 30, 2001 internal Elpida e-mail about bidding at an upcoming Sun reverse auction stating "I talked to my friends today. Inf and Sam are both willing to 'no bid' at next DBE. This is sure data – confirmed back to Korea."

i.   January 10, 2002 internal Samsung e-mail entitled "Sun Module Adders" stating "Sun recently requested all vendors to prepare and submit Costed BOMs for a typical NG DIMM module . . . I have already checked with some competitors: Infineon costs are also in the low $30 range but they told Sun that their adder is $40. Elpida claim costs sub-$30, and informed Sun of a $30+ adder. I will check with Mits [Mitsubishi] and hopefully get some Micron data."

j.   March 5, 2002 internal Elpida e-mail relating to the pricing of a Sun NG DIMM stating "My data from S [Samsung] is 512MB NGDIMM bottom is $220. They are preparing to do BOM level negotiations but I really tried to convince them not to do. I heard Sun will reduce their forecast for March."

59.   Further:

a.   In addition to testifying under oath at trial that each Micron account manager responsible for the six OEM accounts contacted Micron's competitors to get pricing information, Mike Sadler also testified that Micron's account manager for Sun, John Biggs, engaged in such communications. Mr. Sadler further testified that Mr. Biggs and the Micron account managers responsible for the OEM accounts met weekly at what were called "Monday Morning Meetings," where they each would share the pricing information they learned from their competitor contacts.

COMPLAINT OF ORACLE AMERICA, INC.

| | | |
|---|---|---|
| 1 | | Notes taken during these meetings were later destroyed by Micron's |
| 2 | | Alfred Censullo in an effort to protect the participants from criminal |
| 3 | | prosecution. |
| 4 | b. | Mr. Biggs' contacts with competitors included at least communications |
| 5 | | with Tom Quinn, Jim Elliot, and John Cerrato of Samsung and Charles |
| 6 | | Byrd and Jerome McBroom of Hynix.  At least some of Mr. Biggs's |
| 7 | | communications with Micron's competitors concerned pricing for Sun. |
| 8 | | Mr. Biggs' immediate boss at Micron when he served as Sun's account |
| 9 | | manager, Steve Thorsen (Micron's senior director of sales), was also |
| 10 | | aware that Mr. Biggs was communicating with Micron's competitors. |
| 11 | c. | Mr. Biggs' successor as Micron's account manager for Sun, Mike Sporer, |
| 12 | | also had communications with his counterparts at Samsung, Hynix, and |
| 13 | | Infineon regarding Sun's business. |
| 14 | d. | Micron's Mike Sadler had communications with Samsung's Tom Quinn |
| 15 | | regarding DRAM pricing and Sun's DBEs. |
| 16 | e. | Micron's Steve Thorsen discussed Sun's DBEs with Samsung's Tom |
| 17 | | Quinn, including where the companies wanted to position themselves in |
| 18 | | the DBEs. |
| 19 | f. | Samsung's account manager for Sun, Tom Trill, had frequent |
| 20 | | communications with his counterparts at competitors regarding pricing to |
| 21 | | Sun and Sun's DBEs, and passed the information he received up the chain |
| 22 | | of command at Samsung for consideration in setting prices for Sun. |
| 23 | g. | Samsung's Tom Quinn and Elpida's Jim Sogas communicated regarding |
| 24 | | DRAM prices specifically with respect to Sun and met to coordinate bids |
| 25 | | to Sun.  Each pleaded guilty and spent time in prison for such behavior. |
| 26 | h. | Infineon's account manager for Sun, John Bugee, had communications |
| 27 | | with his counterparts at competitors regarding Sun's business.  In addition, |
| 28 | | Mr. Bugee's compensation was tied directly to his ability to provide |

1    Infineon management with competitive inputs relating to Sun from Micron

2    and Samsung.

3        60.    More often, the conspirators were able to conspire with respect to pricing for Sun

4    without explicitly communicating with respect to Sun's prices.  The OEMs negotiated pricing

5    more frequently than other customers, and the conspirators recognized that the OEMs' prices had

6    a material effect on price levels throughout the DRAM market.  Many customers, including Sun,

7    treated the prices obtained by the OEMs as "market prices," or the benchmark for what

8    constituted a "competitive" price.

9        61.    Employees at the conspirators understood that Sun prices were inevitably

10   determined with reference to the pricing that was being given to the OEMs (about which they

11   were frequently communicating and coordinating).  For instance, when asked by a co-worker

12   why Elpida had to wait for IBM and Dell pricing "before we decide on Sun's price," James

13   Sogas, Elpida's account manager for Sun who pled guilty to rigging bids submitted to Sun,

14   replied:  "The reason we need to see IBM/Dell prices is that they are representative of the open

15   market OEM price."  Likewise, Hynix's account manager for both Apple and Sun, Nick

16   LaHerran, previously testified that "Apple was a benchmark price for [pricing] information for

17   Sun."

18       62.    As a result, throughout the Conspiracy Period, the conspirators used the prices

19   they charged to the OEMs to justify price increases (or resist price declines) to Sun and others,

20   thereby achieving the same anticompetitive effect without explicitly coordinating on price.  Sun

21   also incorporated OEM prices into the formula it used to calculate the ceiling prices at its DBEs.

22   The OEM prices were used to set the baseline from which the conspirators competed for Sun's

23   business during the DBEs.

24       63.    The prices the OEMs paid for DRAM and the prices Sun paid for DRAM were

25   highly correlated and moved together throughout the Conspiracy Period.  The conspirators could

26   not have reached agreements on and coordinated pricing for the OEMs without also affecting

27   Sun's prices.  Micron's Michael Sadler acknowledged this link between OEM pricing and

28   pricing for other customers when he testified before the ITC: "Vice Chairman Hillman: Okay.

1   Then how about the pricing variations across, again, PC OEMs versus other OEMs versus non-

2   OEM purchasers? Mr. Sadler: There should not be a material difference."

3         64.    The conspirators also recognized that spot market prices impact contract prices.

4   In a pre-hearing brief to the ITC, Micron stated: "OEM customers are also very aware of spot

5   market pricing and will demand comparable pricing." Likewise, McKinsey & Company, a

6   leading management consulting firm hired by Infineon's senior leadership team during the

7   Conspiracy Period to evaluate Infineon's e-commerce strategy, concluded in a report it submitted

8   to Infineon that "[a]ll pricing is dependent on spot price . . . spot pricing impacts contract pricing

9   . . . industry participants . . . [a]ctively track the spot price to know the 'right' price." In fact,

10  Sun considered and relied on spot prices when negotiating its own DRAM pricing.

11        65.    As a result of this link between spot and contract pricing, the conspirators also

12  engaged in cartel communications with respect to the spot market. Examples of such

13  communications include:

14          a.    November 13, 2001 internal Samsung e-mail noting "[t]he recent increases

15                in spot market pricing is due to Micron and Infineon intentionally

16                withholding product from the spot market."

17          b.    November 14, 2001 internal Samsung e-mail entitled "Today's Market

18                Conditions" stating "Perhaps [as] an after effect of the sudden raising of

19                prices yesterday, today's American market is very quiet . . . For the

20                moment, [Hynix has] agreed to operate this week at the prices . . . M

21                Company [Micron] also says that they would participate in raising the spot

22                price."

23          c.    December 3, 2001 internal Elpida e-mail stating "Hynix, Samsung, and

24                Infineon are coorperating [sic] to raise spot price for Dec contract

25                negotiation."

26          d.    January 30, 2002 internal Samsung e-mail entitled "Micron Channel

27                Update" stating "Micron is holding fast at $4.00 and $8.00 for 128Mb and

28                256Mb SDRAM . . . Dropping the channel [spot] price would decrease

1          their leverage for February OEM contract price increases, which are

2          currently underway."

3     e.   May 7, 2002 internal Micron e-mail entitled "spot 5/7" stating "Hynix is

4          calling a meeting with Samsung to stabilize the pricing at $35 for 128MB

5          at core customers and maintaining a price of slightly above $3 on the

6          spot."

7     66.  During the Conspiracy Period, the conspirators also engaged in coordinated

8  supply controls to increase and stabilize DRAM prices for all their customers. In some cases,

9  they explicitly colluded on reducing DRAM production or supply, engaging in regular

10  communications and meetings to discuss and exchange specific production and supply

11  information. Examples of such communications include:

12     a.   October 12, 1999 internal Infineon meeting memorandum listing the

13          following as "[r]egularly shared information between SEC [Samsung] and

14          competitors," including Micron: "Capacity information: Product by

15          density, total amount, organization (quarterly)" and "Pricing strategy."

16     b.   November 1999 internal Infineon memorandum indicating that Samsung

17          and Hynix met 1-2 times per month to share information on these topics,

18          as well as pricing, while Micron and "Taiwan competitors" also met.

19     c.   May 25, 2000 internal Micron e-mail stating "Met with Hyundai [Hynix's

20          predecessor] and Samsung folks today for a few beers. Interesting to

21          know that Hyundai is cutting their allocation to half from 4M/qtr to 2m/qtr

22          to Maxtor. Samsung is out of the picture since they have indicated the

23          1Mx16 at $3.50. Samsung is selling the 1Mx16 to WD at $3.25 while at

24          Seagate is at $3.30. Looks like we might want to increase pricing or

25          reduce qty to Maxtor based on this info. Current situation of output per

26          month are as follows: Samsung: 10Million 64Meg Async, 7 to 8 Million

27          128Meg SDRAM, 15Million 64 Meg; Hyundai: 3Million 64Meg Async, 5

28          to 6million 128Meg, 40Million 64Meg SDRAM." A subsequent email

1     sent on May 26, 2000 indicates that Micron did attempt to increase its

2     pricing based on this information.

3    d.   July 3, 2001 internal Hynix e-mail stating "Mike Sadler [of Micron]

4     wanted to discuss with us on the measures to stabilize the market price.

5     Good move, right? Farhad got the same message from Mike this morning.

6     I think your diplomacy is working."

7    e   September 20, 2001 internal Infineon e-mail stating "I talked to Mike

8     Sadler" and then describing in detail Micron's inventory and production

9     levels, plans for DRAM production, and current negotiations with a

10     customer. The e-mail also states: "On the assumption that Hynix gets new

11     money, they [Micron] would consider taking supply out of the market if

12     others do the same; either by reducing waferstarts or destroying all

13     inventories. Follow up next week . . . YW Lee [of Samsung] was planning

14     on meeting with [Steve] Appleton next week but cancelled . . . . MU

15     [Micron] thought Lee wanted to talk about cut backs."

16    f.   October 24, 2001 internal Micron e-mail stating "Talked to Sammy

17     [Samsung] and they are still planning to limit their output to 8Millions per

18     month."

19    g.   November 9, 2001 internal Micron e-mail stating "We are limiting our

20     customers volumes and we know that Samsung is doing the same."

21    h.   November 13, 2001 internal Elpida e-mail stating "Micron and all others

22     have cut back production, but they also have inventory . . . Real demand

23     has not changed."

24    i.   November 15, 2001 internal Hynix e-mail stating "Micron is reducing

25     Apple hub inventories in order to create an artificial shortage and will

26     follow SS [Samsung] or Hynix, if Apple accepts a price increase."

27    j.   December 2001 internal Elpida e-mail stating "the dynamics are pretty

28     much unrelated to true market forces. There is no organic reason for prices

to increase i.e. demand increases. This is purely supply control . . . Price increase cannot happen naturally without reduced supply . . . price changes need to be forced to happen."

k.   January 16, 2002 internal Elpida presentation stating "Recent production cuts by all DRAM vendors has finally taken effect - Supply has been reduced - Inventories are being consumed quickly - Prices are moving up quickly (up 150% since Dec.)."

l.   January 24, 2002 internal Micron e-mail entitled "Information Sharing with Elpida" stating "We shared thoughts on industry supply, and I was trying to understand their fab situation in more detail.  We both concur that the current shortage is primarily due to capacity utilization in the industry.  Although there is some increased demand, it is modest compared to the capacity throttling."

67.   More commonly, the conspirators manipulated DRAM supply through less obvious means.  For example, DRAM supply could be affected by the timing of the introduction of new products or by altering the particular mix of DRAM products being produced at a given time.  One industry analyst and expert retained by Micron in related litigations involving the DRAM cartel, Victor De Dios, identified other means:

> DRAM companies have different ways of adjusting supply to influence price: inventory management; immediate wafer production cuts; and reduction of bit supply growth through reduced capital spending and quicker migration to new processes at the expense of yields.

68.   The conspirators created the perception of supply shortages by reducing their DRAM inventories at shared hub facilities in advance of DRAM price increases.  Micron's Michael Sadler previously testified, that it was "general practice" to withdraw or withhold DRAM inventories from customer hubs before price increases were instituted in order to create the "perception" of supply shortages, and these deliberate efforts to reduce inventory levels were concealed from customers in order to facilitate this "perception."

69.   Further, the conspirators were well-aware of the illegality of their conduct. In fact, one Elpida employee warned another not to put price-fixing information in emails: "I am just looking out for you . . . I don't think you'd look too good in a pale blue jumpsuit."

70.   Moreover, the conspiracy was highly effective. During the Conspiracy Period, DRAM prices for both the OEMs and Sun were artificially inflated by the conspiracy above the price levels that would have prevailed in the absence of the conspiracy.

**E.   Micron's Participation in DRAM Cartel**

71.   Throughout the Conspiracy Period, Micron played a central role in the conspiracy. High-level Micron executives, including Michael Sadler, engaged in communications regarding DRAM pricing with executives at Micron's co-conspirators and reached agreements and understandings with respect to future prices that would be charged to their mutual customers.

72.   Account managers at Micron also engaged in frequent discussions with co-conspirator account managers in advance of price negotiations with their mutual customers, and as a result of these discussions, reached understandings with respect to the price ranges within which suppliers would quote at upcoming negotiations. In fact, such contacts were encouraged by Micron's management. The account managers would pass along price and other competitively-sensitive information to their immediate supervisors, as well as to the aforementioned high-level executives, for the purpose of using this information to determine DRAM prices and avoiding competition with Micron's co-conspirators. The account managers also widely circulated pricing information from competitors during weekly meetings and through other means or otherwise made such information available to all individuals at the company who were responsible for setting DRAM prices charged by Micron to various customers. Micron's account managers for Sun attended those weekly meetings.

73.   Micron even maintained a central file that organized the DRAM pricing information it received from its competitors. As explained in an internal Micron e-mail:

> The attached spreadsheet is kept in the G drive under BLauer and called "price war." Each RSM [Regional Sales Managers] with one of the 6 Computer Accounts on the spreadsheet will need to update their pricing on a real-time basis as well as update the competitor's pricing portion. Also, please update the "date"

1    on the chart. The purpose of this tool is for the RSMs, ASMs [Account Sales
     Managers], and Mike [Sadler] to have instant access to real-time competitor
2    pricing info in our top Computer Accounts.  It is CRITICAL for this spreadsheet
     to be updated on a realtime basis in order for it to be a useful tool to everyone.
3    Please make sure you remember to update this with your price changes as well as
     competitor info.  Thanks.
4

5        74.    Micron has acknowledged in its statement of conspiratorial conduct that dozens of

6    its executives and other employees had conspiratorial contacts with competitors – including

7    Hynix, Infineon, Samsung, and Elpida – during the Conspiracy Period with regard to at least the

8    following customers:  Sun, Apple, Dell, Compaq, IBM, Gateway, HP, Cisco, Thomson, Seagate,

9    and Maxtor.  Those employees include:  Tom Addie, James Alt, Don Baldwin, Jon Biggs, Alfred

10   Censullo, Joe D'Esopo, Courtney Daigle, Mike Grant, Roger Hawkins, Mark Hutchison, Gary

11   Kotterman, Bill Lauer, Terry Lee, Danny Lim, Lionel Lim, Jason Lim, Michael Low, Dan

12   Morrissey, Jon Ostberg, Shelah Russell, Mike Sadler, Michael Sporer, Steve Thorsen, Fred

13   Waddel, Keith Weinstock, and Gary Welch.  A number of these individuals have already

14   admitted their involvement in the conspiracy to fix DRAM prices.

15       75.    At the criminal trial of Hynix's former Vice President of Sales, Gary Swanson,

16   Michael Sadler, the executive at Micron with ultimate DRAM pricing responsibility, testified

17   that he had regular discussions with Mr. Swanson regarding confidential DRAM pricing

18   information, including plans to raise prices, during the time period 1999 through 2002.

19   According to Mr. Sadler, he used the information he received from Mr. Swanson to achieve

20   higher DRAM prices for Micron.  He also testified that through conversations with Mr.

21   Swanson, Micron and Hynix were able to reach mutual understandings "on each company's

22   pricing intentions," "price direction," and intent to raise prices.  At the trial, Mr. Sadler also

23   testified that he had discussions regarding DRAM pricing with Peter Schaefer, Vice President of

24   Sales at Infineon, and Tom Quinn, Vice President of Sales at Samsung, and that he reached

25   mutual understandings with Messrs. Schaefer and Quinn regarding the prices at which Micron,

26   Infineon, and Samsung would sell DRAM.

27       76.    Mr. Sadler further testified at the trial that, in October 2001, he embarked on what

28   he described as an "absolutely unlawful" trip around the world to discuss with Micron's

1    competitors – including Hynix, Samsung, and Infineon – the reduction of DRAM capacity and

2    supply.  He testified that shortly after he returned from this trip on October 9, 2001, Micron

3    announced a partial shutdown of its production facility that reduced Micron's DRAM supply by

4    10-15% and led to increased DRAM prices.  Mr. Sadler also testified that in November 2001, he

5    instructed Micron personnel to pull inventory out of off-site hub facilities in order to reaffirm the

6    message to the customer base that prices were going up and to prevent them from pulling the

7    inventory out of the hubs at a lower price than what the price would be when they actually

8    needed the material.  Several days after meeting with Mr. Sadler, Infineon prepared to reduce

9    wafer starts and, like Micron, began reducing its hub inventories.  After meeting with Mr. Sadler,

10   Samsung informed others that it too would be cutting production.

11         77.    At the same trial, Steve Appleton, Micron's CEO, testified that he knew that Mr.

12   Sadler had been contacting Hynix, Infineon, and Samsung to discuss the DRAM market

13   generally, and DRAM pricing specifically.

14   **F.    Micron's Income During the Conspiracy Period**

15         78.    Micron generated significant operating income during the Conspiracy Period.  In

16   fact, financial reports filed publicly by Micron indicate that its consolidated business realized

17   operating income of approximately $700 million during the Conspiracy Period.

18         79.    In the quarter June through August 2000, when DRAM prices and overcharges

19   were at their highest during the Conspiracy Period, Micron realized operating income of more

20   than $1 billion, an amount that is more than double the highest operating income it realized in

21   any quarter outside of the Conspiracy Period from 1994 through 2008.

22   **VII.   The Department of Justice Investigation**

23         80.    On June 18, 2002, Micron announced it had been cooperating with a DOJ

24   investigation of the DRAM industry.  In connection with its amnesty bid, Micron admitted to

25   participating in the DRAM cartel and has escaped all criminal liability by turning in its co-

26   conspirators.

27         81.    By June 20, 2002, co-conspirators Hynix, Infineon, and Samsung confirmed that

28   they had received subpoenas from a grand jury investigating DRAM collusion.

82.   On September 12, 2003, co-conspirator Elpida announced that it had received subpoenas from the DRAM grand jury.

83.   On or about September 4, 2004, co-conspirator Infineon entered into a plea agreement with the U.S. government pursuant to which it agreed to plead guilty to conspiring to fix prices in the DRAM market between July 1999 and June 2002.

84.   On April 21, 2005, the DOJ announced that it had entered into a plea agreement with co-conspirator Hynix pursuant to which Hynix agreed to plead guilty to conspiring to fix prices in the DRAM market between April 1999 and June 2002.

85.   On or about October 13, 2005, the DOJ announced that it had entered into a plea agreement with co-conspirator Samsung pursuant to which Samsung agreed to plead guilty to conspiring to fix prices in the DRAM market between April 1999 and June 2002.

86.   Three months later, on January 30, 2006, the DOJ announced that it had entered into a plea agreement with co-conspirator Elpida pursuant to which Elpida agreed to plead guilty to conspiring to fix prices in the DRAM market between April 1999 and June 2002.  In addition, Elpida admitted that it conspired to rig bids submitted to Sun.

87.   The DOJ's investigation also resulted in fifteen former and current Samsung, Hynix, Infineon, and Elpida executives being fined and imprisoned for their role in the DRAM conspiracy.

88.   One Elpida Memory (USA), Inc. executive, D. James Sogas, and one Samsung Semiconductor, Inc. executive, Thomas Quinn, specifically admitted to conspiring to rig bids submitted to Sun.

89.   In addition, one Micron employee, Alfred P. Censullo, pled guilty to obstruction of justice in connection with his efforts to hide the DRAM conspiracy from the DOJ.

## VIII.   Tolling of Applicable Statute of Limitations

90.   Sun had no knowledge of the combination and conspiracy alleged herein, or of any facts that might have led to the discovery thereof in the exercise of reasonable diligence, prior to June 2002, when defendant Micron first disclosed publicly that the DOJ was investigating the DRAM industry.

91.     Prior to that time, Micron and its co-conspirators engaged in a successful price-fixing conspiracy concerning DRAM, which they affirmatively concealed, at least in the following respects:

a.      by meeting secretly to discuss prices, customers, and markets for DRAM sold in the United States and elsewhere;

b.      by agreeing among themselves at meetings and in communications not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communication in furtherance of the illegal scheme;

c.      by using consortiums and other trade or industry associations to cloak cartel activities;

d.      by avoiding creating a written record of illegal communications;

e.      by concealing competitor communications by referring to co-conspirators and coordinated activities by abbreviated names or designators; and

f.      by giving false reasons for price increases.

92.     During the Conspiracy Period, Sun could not have discovered the existence of the combination and conspiracy alleged herein at an earlier date by the exercise of reasonable due diligence because of the deceptive practices and techniques of secrecy employed by Micron and its co-conspirators to avoid detection and affirmatively conceal such violations.  In fact, at the trial of Hynix's Gary Swanson, a number of Micron employees testified under oath that they actively attempted to conceal the illegal activities.  For example, Micron's Steven Thorsen testified as follows:

> Q. Now, Mr. Thorsen, did you ever try to hide the fact or mask the fact that you were having these conversations [with competitors]?  A. Yes, I did.  Q. And how did you do that?  A. In written form I would – I don't recall ever explicitly stating in an email that I got this information from a competitor and, maybe more specifically, the name of the representative at the competitor.  I used terms like, 'I am confident' or, 'I'm quite confident,' or, 'I have a sense that certain information about what our competitors were doing was true.'  And so I would communicate to people that reported to me in that manner, sort of, if I could use the word, 'masking' to try to hide the fact, if you will, that I was – I had got the information directly from a competitor.  Q. Now, when you would write, 'I am confident,' or 'I am quite confident,' what did that communicate to the people you were sending the emails to?  A. I believe that it communicated to them that the information that was in that email came directly from competitors.

93.     Likewise, at the trial, Micron's Keith Weinstock testified as follows:

Q. Now, did you ever try to hide the fact that you were meeting with Mr. Palonsky? A. Yes, ma'am. Q. And how would you do that? A. Well, again, we talked about the fact that I would try not to use email or any written communication to document this, but also, when we met for lunch, I would not put Paul's name on the expense statement. Q. Now, did you meet with Mr. Palonsky in certain places to avoid detection? A. Yes, ma'am. We met at Darryl's restaurant in Durham for that purpose. Q. And who were you worried would find out that you were meeting with Mr. Palonsky? A. We didn't want IBM or any of the other suppliers to see us meeting.

94.     In addition, Micron and its co-conspirators consistently ascribed their price increases to ordinary market forces and considerations, including, without limitation, falsely attributing price increases to increased demand, shortages in supply, increased manufacturing costs, increased prices of labor and of raw materials, and/or insufficient production capacity. For example, when asked, in a December 4, 2001 interview published in Simmtester.com, why DRAM prices had recently increased sharply and suddenly, Steve Appleton, Micron's CEO, responded:

I have no idea. There clearly was a belated increase in demand as the seasonal rebound we had expected two-and-a-half months earlier finally kicked in. And, clearly the Japanese are cutting back their DRAM production. Even Hynix, which is so unpredictable, cut some production by temporarily closing its Eugene, Ore., fab. When it was running at 40K wafer capacity a month, that fab alone probably had about 2.5% of the world's DRAM production.

95.     Likewise, on December 18, 2001, during an analyst conference call, Micron's Michael Sadler stated:

In the latter half of October we saw a significant uptake in demand and by the first quarter of November this demand strength resulted in sharp spot market price increases. The robust demand environment has continued beyond the reporting period and today, market prices are trending up in both the [spot] market and with OEM customers. The strengthening of the business in this particular timeframe was not unexpected as we are in the midst of the typical high point with respect to demand seasonality.

96.     Other examples include:

a.      In a September 13, 1999 Electronic News article, Avo Kanadjian, Vice President of Marketing at Samsung, stated "Because we see the value PC

1      and free PCs entering the market at extraordinary numbers, DRAM

2      oversupply has silently gone into a shortage."

3      b.    In a May 14, 2001 Financial Times article, Ulrich Schumacher, Infineon's

4      CEO, stated "There has been considerable under investment in memory

5      chip production, which means that once demand picks up prices could

6      jump 20 per cent or more."

7      c.    In a April 15, 2002 press release, Hynix represented that its increased

8      revenues resulted from increased demand in the DRAM market.

9      97.    During the Conspiracy Period, Micron and its co-conspirators also falsely

10 informed their customers that they were unable to sell their products at a lower price due to

11 increased manufacturing costs, increased prices of labor and raw materials, and insufficient

12 production capacity.

13      98.    Sun had no reason to disbelieve these statements. Furthermore, most of the

14 explanations provided by Micron and its co-conspirators involved non-public and/or proprietary

15 information completely in their control such that Sun could not verify the accuracy of the

16 explanations. Micron's and its co-conspirators' purported reasons for their price increases for

17 DRAM were materially false and misleading and were made for the purpose of concealing their

18 anti-competitive scheme alleged herein. The price of DRAM was artificially inflated and

19 maintained as a direct result of Micron's and its co-conspirators' anticompetitive activities, the

20 occurrence of which was a substantial, but undisclosed, factor in the pricing of DRAM during

21 the Conspiracy Period.

22      99.    In addition, when the DOJ first began investigating the DRAM industry, the

23 initial reaction of Micron's employees was to further mask their illegal activities. Alfred

24 Censullo, a sales manager at Micron, pled guilty to federal charges of obstruction of justice for

25 altering and withholding documents responsive to a grand jury subpoena issued to Micron. At

26 his sentencing hearing, Mr. Censullo acknowledged that those documents, which consisted of

27 notes he took during weekly conference calls with other regional sales managers at Micron,

28

1  including those account managers responsible for Sun, reflected discussions regarding the prices

2  at which Micron's competitors would sell DRAM to certain customers.

3      100.    Even after the DOJ's investigation of the DRAM industry became public in June

4  2002, Micron continued to deny the existence of a conspiracy. Micron's Vice President of

5  Corporate Affairs, Kipp Bedard, stated that Micron "does not believe it has violated U.S.

6  antitrust laws" and assured the public that "[t]he DRAM business is highly competitive." And as

7  late as November 3, 2004, Micron's CEO, Steve Appleton, asserted that it was "not possible to

8  control prices in [the DRAM] industry" and that the DOJ's investigation was merely

9  "theoretical." Just days later, however, Mr. Appleton, who was facing intense scrutiny from the

10  DOJ for his comments, was forced to make an embarrassing about-face. On November 11,

11  2004, after Micron apparently decided to apply for antitrust amnesty from the DOJ, he finally

12  admitted that the "DOJ's investigation revealed evidence of price fixing by Micron employees

13  and its competitors on DRAM sold to certain computer and server manufacturers."

14      101.    On February 24, 2006, Sun and Micron entered into a Tolling Agreement in order

15  to ensure further tolling of the applicable statutes of limitation. The Tolling Agreement remains

16  in full force and effect as of the date of the filing of this Complaint and applies to Oracle, as

17  successor in interest to Sun.

18      102.    As a result of Micron's and its co-conspirators' fraudulent concealment of the

19  DRAM conspiracy and the Tolling Agreement entered into between Sun and Micron, any

20  applicable statutes of limitation affecting Oracle's claims have been tolled.

21  IX.   **Violations Alleged**

22                    **FIRST CAUSE OF ACTION**

23                    **Violation of Sherman Act**

24      103.    Oracle incorporates and realleges, as though fully set forth herein, each and every

25  allegation set forth in the preceding paragraphs of this Complaint.

26      104.    During the Conspiracy Period, Micron and its co-conspirators, by and through

27  their officers, directors, employees, agents, or other representatives, entered into a continuing

28

1    contract, combination and/or conspiracy to unreasonably restrain trade and commerce in

2    violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

3          105.    Micron and its co-conspirators, by their unlawful conspiracy, artificially raised,

4    inflated, and maintained the market price of DRAM as herein alleged.

5          106.    The contract, combination, and/or conspiracy consisted of a continuing

6    agreement, understanding, and concert of action among Micron and its co-conspirators, the

7    substantial terms of which were to fix, raise, maintain, and stabilize the prices of, and/or allocate

8    the market for, DRAM sold throughout the world, including the United States.

9          107.    Upon information and belief, for the purposes of formulating and effectuating

10   their contract, combination, and/or conspiracy, Micron and its co-conspirators did those things

11   they contracted, combined or conspired to do, including:

12              a.    participating in meetings and conversations to discuss the prices of and/or

13                    allocate the global market for DRAM;

14              b.    agreeing to manipulate capacity, production, and prices so as to boost

15                    sagging DRAM prices in a manner that deprived direct purchasers of free

16                    and open competition;

17              c.    issuing price announcements and price quotations in accordance with the

18                    agreements they reached; and

19              d.    selling DRAM to customers throughout the world, including the United

20                    States, at artificially inflated and non-competitive prices.

21         108.    The above contract, combination and/or conspiracy has had the following effects,

22   among others:

23              a.    price competition in the sale of DRAM by Micron and its co-conspirators

24                    has been restrained, suppressed, and eliminated throughout the world,

25                    including the United States;

26              b.    prices for DRAM sold by Micron and its co-conspirators have been raised,

27                    fixed, maintained, and stabilized at artificially high and noncompetitive

28                    levels throughout the world, including the United States; and

c.    purchasers of DRAM from Micron and its co-conspirators have been deprived of the benefit of free and open competition in the purchase of DRAM.

109.    As a direct and proximate result of the unlawful conduct of Micron and its co-conspirators in furtherance of their continuing contract, combination, and/or conspiracy, Sun, now Oracle, has been injured in its business and property in that it has paid more for DRAM in the United States than it otherwise would have paid in the absence of Micron and its co-conspirators' unlawful price fixing conspiracy.

## SECOND CAUSE OF ACTION

### Violation of California's Cartwright Act

110.    Oracle incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

111.    During the Conspiracy Period, Micron and its co-conspirators, by and through their officers, directors, employees, agents, or other representatives, violated Section 16700 *et seq.* of the California Business and Professions Code ("Section 16700" or "Cartwright Act") by entering into and engaging in a continuing unlawful trust in restraint of trade and commerce, as described above. During the Conspiracy Period, Micron and its co-conspirators effected this unlawful trust, and violated Section 16700, by combining, conspiring, and/or agreeing to fix, raise, stabilize, and maintain the prices of, and/or allocate the market for, DRAM at supra-competitive levels. Section 16720 of the Cartwright Act expressly forbids the creation of such unlawful trusts.

112.    The purpose of Micron and its co-conspirators' unlawful combination, conspiracy, and/or agreement was to create artificially-inflated DRAM prices in the marketplace, thereby providing Micron and its co-conspirators with substantially higher revenues and profits than would otherwise have been the case in a truly competitive market.

113.    In forming, and in furtherance of, this unlawful combination, conspiracy, and/or agreement, Micron and its co-conspirators engaged in acts, practices, and courses of conduct, which included, but are not limited to, the following:

a.  participating in meetings and/or discussions amongst themselves, as discussed more fully above, for the purpose of coordinating DRAM production reductions to limit supply and fix, raise, stabilize, and maintain the prices of, and/or allocate the market for, DRAM;

b.  participating in meetings, discussions, and/or communications amongst themselves, as discussed more fully above, for the purpose of exchanging information about DRAM prices and setting price ranges for DRAM to fix, raise, stabilize, and maintain the prices of, and/or allocate the market for, DRAM;

c.  participating in meetings, discussions, and/or communications amongst themselves, as discussed more fully above, for the purpose of setting DRAM contract prices for OEM and other large customers to fix, raise, stabilize, and maintain the prices of, and/or allocate the market for, DRAM; and

d.  using their best efforts to ensure that the prices each charged its customers for DRAM were within the price range, or at the same price, agreed to during the meetings, discussions, and/or communications held amongst themselves.

114.  As a direct consequence of Micron's and its co-conspirators' acts, practices, and course of conduct in implementing the unlawful trust, the following have occurred:

a.  DRAM price competition has been restrained, suppressed, and/or eliminated, including, but not limited to, within and throughout the State of California;

b.  DRAM price has been fixed, raised, maintained, and stabilized at a high and artificial level, including, but not limited to, within and throughout the State of California;

c.  Sun, now Oracle, has been deprived of the benefit of free and openly competitive negotiations for DRAM in the marketplace; and

COMPLAINT OF ORACLE AMERICA, INC.

1              d.     Sun, now Oracle, has been forced to pay artificially high prices for DRAM
2          used in its servers and work stations.

3          115.    As a direct and proximate result of Micron's and its co-conspirators' unlawful
4   combination, conspiracy and/or agreement, Sun, now Oracle, has been injured in its business and
5   property in that it had to pay more for DRAM than it would have paid in an otherwise free and
6   open marketplace. Under Section 16750(a) of the Business and Professions Code, Oracle is
7   entitled to interest on its damages from the date of service of this Complaint until entry of
8   judgment thereon, and to its costs of suit, including reasonable attorneys' fees and treble
9   damages.

10                          **THIRD CAUSE OF ACTION**

11                    **Violation of California's Unfair Competition Act**

12         116.    Oracle incorporates and realleges, as though fully set forth herein, each and every
13   allegation set forth in the preceding paragraphs of this Complaint.

14         117. ·  Oracle brings this action pursuant to Sections 17203 and 17204 of the California
15   Business and Professions Code, to obtain restitution from Micron for acts, as alleged herein, that
16   violate Section 17200 *et seq.* of the California Business and Professions Code, commonly known
17   as the Unfair Competition Act.

18         118.    During the Conspiracy Period, Micron and its co-conspirators, by and through
19   their officers, directors, employees, agents, or other representatives committed, and continue to
20   commit, acts of unfair competition, as defined by Sections 17200 *et seq.* of the California
21   Business and Professions Code. Micron's and its co-conspirators' acts of unfair competition,
22   more fully alleged above, included participating in an unlawful combination, conspiracy, and/or
23   agreement to fix, raise, stabilize, and maintain the prices of, and/or allocate the market for,
24   DRAM prices and making misrepresentations, or fraudulently concealing relevant information,
25   concerning the reason for increased DRAM prices.

26         119.    Oracle, as successor in interest to Sun, has standing to bring this action, because
27   Sun purchased DRAM from Micron and its co-conspirators during the Conspiracy Period. In
28   doing so, Sun was injured by Micron's and its co-conspirators' unlawful actions, because it paid

1   more for DRAM than it otherwise would have, as described more fully above.  These higher

2   prices caused Sun to lose money and customers, who could not afford to purchase Sun's products

3   containing artificially high-priced DRAM.

4         120.   Micron's and its co-conspirators' conduct as alleged herein violates Section

5   17200 *et seq.*  The unlawful combination, conspiracy, and/or agreement effected by Micron and

6   its co-conspirators, as well as their acts, omissions, misrepresentations, practices, and non-

7   disclosures in furtherance thereof, as alleged herein, constitute a common continuous and

8   continuing course of conduct of unfair competition by means of unfair, unlawful, and/or

9   fraudulent business acts or practices within the meaning of California Business and Professions

10   Code, Section 17200 *et seq.* including, but in no way limited to, the following:

11              a.    Micron's and its co-conspirators' violations of 15 U.S.C. § 1 and Section

12                    16700 *et seq.,* of the California Business and Professions Code, as set

13                    forth above;

14              b.    Micron's and its co-conspirators' acts, omissions, misrepresentations,

15                    practices, and non-disclosures regarding how they set DRAM prices, as

16                    described above – whether or not in violation of 15 U.S.C. § 1 and

17                    Section 16700 *et seq.* of the California Business and Professions Code,

18                    and whether or not concerted or independent acts – are otherwise unfair,

19                    unlawful, or fraudulent;

20              c.    Micron's and its co-conspirators' acts and practices, as alleged above, are

21                    unfair to consumers of DRAM in the State of California and throughout

22                    the United States, within the meaning of Section 17200 *et seq.,* California

23                    Business and Professions Code; and

24              d.    Micron's and its co-conspirators' acts and practices, as alleged above, are

25                    fraudulent or deceptive within the meaning of Section 17200 *et seq.* of the

26                    California Business and Professions Code.

27         121.   The aforementioned unlawful and unfair business practices of Micron and its co-

28   conspirators have injured and present a continuing threat of injury to Oracle.  Micron's and its

1  co-conspirators' conduct has restrained competition in the DRAM market, has caused Sun, now

2  Oracle, to pay supra-competitive and artificially-inflated prices for DRAM, and has deceived,

3  and may continue to deceive, Oracle with respect to the manner in which the prices charged for

4  DRAM have been and will be set. Thus, Oracle is informed and believes that Micron and its co-

5  conspirators may continue to persist in this conduct and commit the aforementioned acts unless

6  and until the Court orders Micron to cease and desist.

7          122.    Micron and its co-conspirators have been unjustly enriched as a result of their

8  wrongful conduct and unfair competition. Oracle is accordingly entitled to equitable relief,

9  including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and

10  benefits in order to restore money lost by Sun and that may have been obtained by Micron and its

11  co-conspirators as a result of such unfair business acts and practices, pursuant to the California

12  Business and Professions Code, Sections 17203 and 17204. In addition, Oracle seeks a

13  permanent injunction enjoining Micron, its officers, directors, employees, agents, or other

14  representatives, and all others acting in concert with Micron to cease and desist from colluding

15  together to fix, raise, stabilize, and maintain the prices of and/or allocate markets and customers

16  for DRAM and making misrepresentations, or fraudulently concealing relevant information,

17  concerning the reason for increased DRAM prices.

18  **X.     Damages/Restitution**

19          123.    During the Conspiracy Period, Sun purchased DRAM from Micron and its co-

20  conspirators, or their subsidiaries, agents, and/or affiliates, and, by reason of the antitrust

21  violations herein alleged, paid more for such products than they would have paid in the absence

22  of such antitrust violations. As a result, Sun, now Oracle, has sustained damages to its business

23  and property, and Micron and its co-conspirators wrongfully acquired money from Sun in an

24  amount to be determined at trial.

25  **XI.    Prayer for Relief**

26          WHEREFORE, Oracle demands judgment against Micron as follows:

27          124.    A declaration that the unlawful contract, combination and/or conspiracy alleged

28  herein is an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman

1    Act, 15 U.S.C. § 1, and in violation of Sections 16700 *et seq.* and 17200 *et seq.* of the California

2    Business and Professions Code;

3          125.    An injunction enjoining, preliminarily and permanently, Micron and all those

4    acting in concert or in active participation with Micron from continuing the unlawful

5    combination and conspiracy alleged herein;

6          126.    An award to Oracle of damages, as provided by law and based on joint and

7    several liability, in an amount to be trebled in accordance with federal and California antitrust

8    laws;

9          127.    For restitution and disgorgement of revenues, earnings, profits, compensation, and

10    benefits that have been wrongfully taken by Micron and its co-conspirators from Sun, now

11    Oracle, as provided by 17200 *et seq.* of the California Business & Professions Code;

12          128.    An award to Oracle for the costs of this suit, including expert fees and reasonable

13    attorneys' fees, as provided by law;

14          129.    An award of pre- and post-judgment interest at the highest legal rate from and

15    after the date of service of the initial Complaint in this action; and

16          130.    An award to Oracle for such other and further relief as the nature of this case may

17    require or as this Court deems just, equitable and proper.

18    **XII.    Demand for Jury Trial**

19          131.    Plaintiff Oracle demands a trial by jury, pursuant to Federal Rules of Civil

20    Procedure, Rule 38(b), of all triable issues.

21

22    DATED: September 24, 2010             CROWELL & MORING LLP

23

24                                 Suzanne E. Rode (CA Bar No. 253830)
CROWELL & MORING LLP

25                                 275 Battery Street, 23rd Floor
San Francisco, CA 94111

26                                 Telephone: 415-986-2800
Facsimile: 415-986-2827

27

28                                 Jerome A. Murphy (*pro hac vice pending*)
Kent A. Gardiner (*pro hac vice pending*)
Matthew J. McBurney (*pro hac vice pending*)

COMPLAINT OF ORACLE AMERICA, INC.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: 202-624-2500
Facsimile: 202-628-5116

*Counsel for Plaintiff Oracle America, Inc.*

COMPLAINT OF ORACLE AMERICA, INC.